COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Clements and Senior Judge Annunziata


TRISHA ROBESON

                                                  MEMORANDUM OPINION[*]
v.      Record No. 1891-08-3                           PER CURIAM
                                                   DECEMBER 23, 2008
ROANOKE CITY DEPARTMENT
  OF SOCIAL SERVICES


             FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                         Charles N. Dorsey, Judge

        (Rena G. Berry, on brief), for appellant.  Appellant submitting on
        brief.

        (William M. Hackworth, City Attorney; Heather P. Ferguson,
        Assistant City Attorney; L. Brad Braford, Guardian *ad litem* for the
        infant child, on brief), for appellee.  Appellee and Guardian *ad
        litem* submitting on brief.


        Trisha Robeson (mother) appeals a decision of the trial court terminating her residual

parental rights to her minor child, J.W.  Mother contends the evidence was insufficient to support

the termination under Code § 16.1-283(B).  Upon reviewing the record and the parties' briefs, we

affirm the trial court's decision.

                    When reviewing a decision to terminate parental rights, we
            presume the circuit court "thoroughly weighed all the evidence,
            considered the statutory requirements, and made its determination
            based on the child's best interests."  "The trial court's judgment,
            'when based on evidence heard *ore tenus*, will not be disturbed on
            appeal unless plainly wrong or without evidence to support it.'"  In
            its capacity as factfinder, therefore, the circuit court retains "broad
            discretion in making the decisions necessary to guard and to foster
            a child's best interests."

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005)

(citations omitted).  However,

> [b]ecause "the rights of parents may not be lightly severed," clear and convincing evidence must establish the statutory grounds for termination.  In the end, the "child's best interests" remain the "paramount consideration" of the court.  Even on this issue, however, we cannot "substitute our judgment" for the circuit court's, but rather review the record only to determine if sufficient evidence supports it.

Id. at 266, 616 S.E.2d at 770 (citations omitted).

Code § 16.1-283(B) provides in its pertinent part that the residual parental rights of a parent of a child found by the court to be neglected or abused and placed in foster care as a result of court commitment[1] may be terminated if clear and convincing evidence proves that it is in the best interests of the child and that:

> 1.  The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2.  It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time.  In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.
>
> Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:
>
> a.  The parent . . . [is] suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development . . . .

---

[1] Mother does not dispute that J.W. was removed from her care on August 1, 2006, and subsequently found to be abused and neglected, placed in the legal custody of DSS, and placed in foster care, as a result of court commitment.

Here, the factual record contains credible evidence to support the trial court's decision to terminate mother's residual parental rights to J.W., and to support a finding that DSS proved by clear and convincing evidence the requirements necessary for termination under Code § 16.1-283(B).

"[V]iew[ing] the evidence in the light most favorable to [DSS,] the prevailing party below[,] and grant[ing] to it all reasonable inferences fairly deducible therefrom, see Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991), it established that on August 1, 2006, J.W. was removed from mother's care when he was five and one-half months old due to abuse and neglect. The incident that precipitated the removal occurred when mother, after ingesting "ginseng seeds" in order to "trip," awoke and believed that she had seen J.W. dead. In reality, J.W. was fine and had not been in mother's care since the previous evening when she had left him at a friend's home. The child protective services worker who responded to the complaint alleging that mother and J.W.'s father were unable to care for J.W. found mother erratic, delusional, and unstable. Mother indicated she had been diagnosed with severe bipolar disorder and postpartum depression. Mother reported she had not been on medication for four years because she did not think she needed it. When mother and father came to DSS the next day, they admitted a history of domestic violence in the home when J.W. was present. On one occasion, mother threw a knife at J.W.'s father, hitting him in the leg. She was charged with felony malicious wounding. As a result of the abuse and neglect finding, J.W. was placed in DSS's legal custody.

The initial foster care plan developed after J.W. was placed in DSS's custody required that mother gain and maintain stable and appropriate housing, successfully complete parenting classes, demonstrate an ability to learn and practice parenting skills, complete a substance abuse assessment and participate in treatment if deemed appropriate, cooperate fully with DSS and any

other service providers, and visit J.W. as scheduled and have appropriate behavior and interaction with J.W. Mother was also referred for a psychological evaluation, asked to attend individual and family counseling, and referred to a domestic violence program.

Mother's housing did not remain stable during the time J.W. was in foster care. She moved numerous times and, according to DSS, was contemplating another move at the time of the trial court termination hearing.[2] While mother reported attending individual and family counseling, she did not sign consent forms for DSS to verify her attendance. Mother completed parenting classes, a substance abuse assessment, and the domestic violence program. Initially, mother's visits with J.W. were inconsistent. She missed eleven visits between August 1, 2006 and March 29, 2007. However, she began to visit more regularly, and beginning June 28, 2007, her visits increased to allow outside community visits with J.W.'s father also present. However, those visits were suspended on July 26, 2007. At that time, J.W.'s father had tested positive for marijuana and lied about his employment, and DSS was concerned about mother's inability to parent by herself, as reported by Tricia D. Thornburgh, the licensed clinical psychologist who had previously evaluated mother. In September 2007, J.W.'s father was arrested for assault and battery and felony abduction of mother.[3] After J.W.'s incarceration, mother's supervised visits with J.W. again became sporadic.

---

[2] Mother testified that she was living in her sister's home in Eagle Rock, Virginia at the time of the trial court termination hearing and that her sister planned to move to Roanoke, Virginia.

[3] J.W.'s father was convicted of abduction, and sentenced to a term of incarceration.

- 4 -

On September 11, 2006, July 26, 2007, and March 10, 2008, mother tested positive for marijuana. In addition, she failed to appear for drug screens on March 5, 2007 and May 1, 2008.[4]

Upon referral by DSS, Thornburgh performed a psychological evaluation of mother on September 20, 2006, in order to assess mother's parenting capacity and current psychological status. Mother presented with a depressed mood, flat affect, and as severely mentally ill with only minor insight into her mental illness. Mother reported to Thornburgh a history of verbal, physical, and emotional abuse by her father. Mother acknowledged she started using marijuana at a young age and continued to do so consistently since that time. Mother admitted having used cocaine and methamphetamines. Mother reported that she had been diagnosed with bipolar disorder, for which she had been prescribed medication, but that she stopped taking it because she did not think it was helpful.[5] Mother admitted having learning problems that have impeded her ability to understand written material as an adult. She admitted twice attempting suicide as a teenager, and a history of domestic disputes between her and J.W.'s father, which resulted in her serving weekend jail time. Thornburgh testified in her May 14, 2008 deposition, which was admitted into evidence at the trial court termination hearing, that even though mother reported she had been taking her medications at the time of the September 2006 evaluation, mother continued to be severely mentally ill.

Thornburgh diagnosed mother with somatization disorder, bipolar disorder, borderline personality disorder, and cannabis dependency. Thornburgh opined that mother's life shows she

---

[4] At the trial court termination hearing, mother denied having a substance abuse problem or that she would benefit from substance abuse treatment, asserting that she had not used marijuana in the three months since the last court date.

[5] On cross-examination at the trial court termination hearing, mother claimed that she had been taking her medications for bipolar disorder and anxiety for approximately six to seven months.

is an individual with a pattern of chronic psychological maladjustment and, as such, is not able to adequately provide parental structure for J.W. Thornburgh further opined that mother's emotional instability, haphazard thinking, unpredictable behaviors, and self-centeredness are "detrimental when it comes to raising a child." Given the chronic nature of mother's psychological problems, Thornburgh opined that she would not anticipate that any of mother's psychological conditions would resolve themselves to the point that she would be able to parent in the "reasonable near future." Thornburgh recommended that mother attend all classes ordered by the court, that she be required to display paperwork demonstrating her compliance with medications, that she be ordered to engage in individual therapy, that she participate in education and treatment for individuals with borderline personality disorder, that she participate in random drug screens, and that she find stable housing and display adequate housekeeping skills. However, Thornburgh opined that even if mother complied with each of those recommendations, mother's mental health would still prevent her from adequately parenting J.W. Thornburgh further opined that even with therapy, mother would still remain significantly mentally ill.

At the trial court termination hearing, mother asserted that her nineteen-year-old sister, who also has a young child, would assist mother in caring for J.W. if he was returned to her. When confronted with the fact that she had previously stated that her sister planned to move to Roanoke, mother stated that mother's boyfriend of eight months would move in with her if her sister moved.

J.W. is thriving in his foster care placement and is meeting all developmental milestones. He is gaining weight and language skills. He is currently placed in a foster care home with his younger brother, who was removed from mother's care in January 2008.

Based upon this record, we find no error in the trial court's determination that DSS proved by clear and convincing evidence that termination of mother's parental rights is in J.W.'s

best interests and that "[i]t is not reasonably likely that the conditions which resulted in [J.W.'s] neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to [mother] within a reasonable period of time."  Code § 16.1-283(B)(2).  DSS's evidence was sufficient to clearly and convincingly prove that mother is "suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that [she] will be able to undertake responsibility for the care needed by [J.W.] in accordance with [his] age and stage of development."  Code § 16.1-283(B)(2)(a).  Furthermore, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities."[6]  Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

In summary, clear and convincing evidence proved termination of mother's residual parental rights was in J.W.'s best interests, and DSS satisfied the statutory requirements of Code § 16.1-283(B) necessary to support such termination.

For these reasons, we affirm the trial court's decision.

Affirmed.

---

[6] Since J.W.'s birth on February 14, 2006, he has been in mother's care for approximately five and one-half months, ending on August 1, 2006, when he was removed from mother's care. At the time of the trial court termination hearing on June 13, 2008, J.W. had been in foster care for approximately twenty-two and one-half months.